CONNECTICUT BANK AND TRUST COMPANY, EXECUTOR
(ESTATE OF OLIVE F. STENGEL) *v.* CYRIL AND JULIA
C. JOHNSON MEMORIAL HOSPITAL ET AL.

SUPERIOR COURT     HARTFORD COUNTY     FILE No. 166569

Memorandum filed June 29, 1972

*Danaher, Lewis & Tamoney,* of Hartford, for the
plaintiff.

*Etalo G. Gnutti,* of Stafford Springs, for the
named defendant.

*Shipman & Goodwin,* of Hartford, for the defendants The Animal Medical Center, The American Feline Society, Inc., The Connecticut Humane Society, The American Humane Society, The Animal Rescue League of Boston, The American Society for the Prevention of Cruelty to Animals, and The American Heart Association.

*Robinson, Robinson & Cole,* of Hartford, for the defendant The Salvation Army, Inc.

*Berman & Bourns,* of Hartford, for the defendant American Anti-Vivisection Society.

*Robert K. Killian,* attorney general, and *Bernard F. McGovern, Jr.,* and *F. Michael Ahern,* assistant attorneys general, for the defendant attorney general.

SHEA, J. On July 2, 1968, Olive F. Stengel died leaving a will which was admitted to the Probate Court for the district of Ellington, the decedent having been a resident of Rockville.

After making one bequest to a church and several bequests to individuals, the will created a trust fund of $100,000 to be known as the "Kate and Leila Foster Memorial," in honor of the testatrix' mother and sister, "to be used in providing hospital care at the Cyril and Julia C. Johnson Memorial Hospital, Incorporated, Stafford Springs, Connecticut." In addition to the standard trust investment clause, this bequest was made subject to the following conditions.

"2. The Cyril and Julia C. Johnson Memorial Hospital, Incorporated shall dedicate a private room which shall be identified by a plaque, appropriately marked as being in memory of Kate and Leila Foster;

"3.  Said private room shall be used only by patients who are members of the Caucasian race as determined by the administrator in charge of the hospital;

"4.  The cost of hospital, nursing, and surgical care and treatment to the extent allowed by the Trustee, which is incurred by patients occupying said room during the existence of this Trust, shall be paid to the hospital from the income earned by the Trust upon presentation of the bills to the Trustee;

"5.  Any patient, if admitted by the hospital as an occupant of this room and if in need of financial assistance, shall qualify for the benefits provided herein;

"6.  The decision of the Trustee as to the identity of the patient to receive the assistance and the extent of the assistance so rendered shall be final, it being recognized that I impose confidence in the Trustee to carry out the intent and purposes of this Trust;

"7.  Any accumulated income which shall not be required for the purposes of the Trust, as determined by the Trustee, shall be distributed annually to The Salvation Army, Inc., to be its absolutely."

In another paragraph of the will, a trust fund of $200,000, to be known as the "Leila Lincoln Foster Foundation," was established for the assistance of students who are members of the Daughters of the American Revolution, or eligible for such membership, in attending Smith College, with a provision for using any surplus funds for other purposes of the college.  The will directed that the residue of the estate be divided in the proportions specified among ten charitable organizations:  Connecticut Humane Society, The Feline Society of New York, The Ellen

Prince Speyer Memorial Hospital of New York City, The American Humane Society (whose principal office is located in Denver, Colorado), The American Anti-Vivisection Society (whose principal office is located in Philadelphia, Pennsylvania), The Animal Rescue League of Boston (whose principal office is located in Boston, Massachusetts), The American Society for the Prevention of Cruelty to Animals (whose principal office is located in New York City), The Salvation Army, Inc., Connecticut Institute for the Blind Trades Department (whose office is located in Wethersfield, Connecticut), The American Heart Association (whose principal office is located in New York City).

The next paragraph of the will reads as follows: "Eighth: The Trusts set forth in this Will shall continue in perpetuity. If, however, for any reason, the trust known as the 'Kate and Leila Foster Memorial' or the trust known as 'Leila Lincoln Foster Foundation' is unable to operate or if by their terms said trusts either violate any law or are not effective due to a lack of sufficient directions, then I direct that upon the determination that such a condition exists, the assets of which the trust is composed shall become part of the rest, residue and remainder of my estate to be administered as provided in paragraph Seventh of this Will." The will also contains standard provisions for payment of taxes and debts, appointment of the trustee and executor, and administrative powers.

The complaint of the plaintiff executor and trustee seeks a construction of the will for the purpose of obtaining answers to the following questions: "(a) Does the limitation in sub-paragraph 3 of Paragraph Fifth of the Will to members of the Caucasian race as determined by the administrator in charge of the hospital violate any law? (b) Is the "Kate and

Leila Foster Memorial" trust able to operate? (c) May the administrator in charge of the hospital comply with the provisions of sub-paragraph 3 of Paragraph Fifth of the Will? (d) If said administrator may not or shall not comply with said sub-paragraph 3, may the Trustee comply with said sub-paragraph? (e) Can the trust established by Paragraph Fifth of said Will be administered without complying with said sub-paragraph 3? (f) If the answer to the foregoing question is in the negative, should the trust corpus be held and its income distributed to The Salvation Army, Inc.; or should the trust corpus go into the residuary estate?"

These questions all pertain to the "Kate and Leila Foster Memorial" trust created by the fifth paragraph of the will. No questions have been raised with respect to the "Leila Lincoln Foster Foundation" established in the sixth paragraph or any other provision of the will.

All of the persons having an interest in the trust fund created by the fifth paragraph of the will have been made parties and have appeared in the action. In addition, the attorney general, who has the duty of protecting the public interest in charities, has been joined. The attorney general has appended to his answer a cross complaint seeking a declaration that the restriction in the fifth paragraph of the will is invalid and an injunction against its execution. The case was submitted upon the pleadings and a written stipulation signed by all of the parties.

1. VALIDITY OF THE RESTRICTION TO "MEMBERS OF THE CAUCASIAN RACE"

It appears that none of the parties claims that the racial restriction in the fifth paragraph can be implemented by the hospital as provided by the testatrix.

The stipulation of facts states that the Cyril and Julia C. Johnson Memorial Hospital has received from the federal government a substantial sum of money, distributed by the state health department, under the Hill-Burton hospital construction program for the construction of hospital facilities, and that additional sums have been requested under this program. See Hospital Survey & Construction Act, 60 Stat. 1040, as amended, 42 U.S.C. §§ 291 to 291o–1. Participation in the Hill-Burton program by a private hospital has been held to involve a state to such an extent that the fourteenth amendment, which forbids racial discrimination by the states, becomes applicable to the hospital. *Simkins* v. *Moses H. Cone Memorial Hospital,* 323 F.2d 959. It is, therefore, unnecessary to consider whether the additional circumstances stipulated—the operation of the hospital under a license issued by the state health department, the receipt of money from the federal government for the care and treatment of beneficiaries under the medicare program, or the receipt of money from the state for care and treatment of paupers— would also warrant a finding of governmental involvement sufficient to constitute the "state action" necessary to subject the hospital to the provisions of the fourteenth amendment. *Eaton* v. *Grubbs,* 329 F.2d 710.

Apart from any federal constitutional provisions, article first, § 20, of the constitution of Connecticut also would prohibit any racial discrimination in the exercise of "civil or political rights" and guarantees "equal protection of the law." The construction given to the analogous provisions of the fourteenth amendment by the federal courts would prohibit the hospital from effectuating the restriction to Caucasians only. There is no reason for this court to depart from that precedent in interpreting the similar language of the state constitution.

In addition, the statute pertaining to discrimination in public accommodations, General Statutes § 53-35, would apply to the hospital as an "establishment, which caters or offers its services or facilities or goods to the general public . . . ." Where the enterprise falls within this statutory definition, "[a]ny discrimination, segregation or separation, on account of race, creed, color, national origin or ancestry, shall be a violation . . . ." It is plain that the hospital could not restrict the use of one of its rooms to "patients who are members of the Caucasian race," as the testatrix provided, without subjecting itself to the criminal penalties imposed for a violation of this statute.

It is concluded that the defendant hospital cannot lawfully comply with the trust restriction to "members of the Caucasian race."

## 2. THE CONSEQUENCES OF INVALIDITY

The principal dispute among the parties is over the consequences of finding that the restriction contained in this bequest violates the law.

In a substantial number of cases dealing with the problem of a racial restriction, the courts have not hesitated to apply the cy pres or approximation doctrine to preserve the charitable trust by effectively deleting the offensive clause. *Daggett* v. *Children's Center,* 28 Conn. Sup. 468; *Pennsylvania* v. *Brown,* 392 F.2d 120; *Smith* v. *Moore,* 225 F. Sup. 434; *Dunbar* v. *Clayton Trust,* 170 Colo. 327; *In re Will of Potter,* 275 A.2d 574 (Del. Ch.); *Howard Savings Institution* v. *Peep,* 34 N.J. 494; *Matter of Hawley,* 32 Misc. 2d 624 (N.Y.); *Wooten* v. *Fitz-Gerald,* 440 S.W.2d 719 (Tex. Civ. App.); *Coffee* v. *William Marsh Rice University,* 408 S.W.2d 269 (Tex. Civ. App.). In these cases the courts purported to find a general charitable intention on the part of the donor which would prevail over his secondary

intention to limit the beneficiaries by race. In a lesser number of cases, where no such dominant charitable intention could be discerned, the trusts have been declared inoperative. *Evans* v. *Abney,* 396 U.S. 435; *LaFond* v. *Detroit,* 357 Mich. 362.

In none of these cases, however, was there such a gift over provision as is contained in paragraph eighth of the will of the decedent: "If, however, for any reason, the trust known as the 'Kate and Leila Foster Memorial' . . . is unable to operate or if by their terms said trusts either violate any law or are not effective due to a lack of sufficient directions, then I direct that upon the determination that such a condition exists, the assets of which the trust is composed shall become part of the rest, residue and remainder of my estate to be administered as provided in paragraph Seventh of this Will."

It is generally held that the cy pres doctrine cannot be applied where the instrument involved contains a provision for a gift over upon failure of the particular purpose. 4 Scott, Trusts (3d Ed.) § 399.2, p. 3095; Restatement (Second), 2 Trusts § 399, comment c. "Since the testator has himself provided for a disposition of the fund in case of the failure of the bequest, that doctrine could have no application, at least in its broader aspect." *Hartford National Bank & Trust Co.* v. *Oak Bluffs First Baptist Church,* 116 Conn. 347, 351. It cannot be disputed that, if any of the conditions have occurred upon which the alternative gift was to take effect, the testatrix' direction that this bequest be distributed under the residuary clause must be followed. The provision for a gift over upon failure of the charity negatives the existence of a general charitable intent, just as the absence of such a provision is evidence of such a purpose. Bogert, Trusts and Trustees (2d Ed.) § 437, p. 426.

It has been argued that the conditions of the gift over—that the trust be "unable to operate or if by their terms said trusts . . . violate any law"— would not occur if the court were to strike out the offensive restriction contained in the bequest under the doctrine of cy pres or the more limited principle of deviation. It is obvious that, until a court has so declared, any provision for a gift over upon failure of a trust could not become effective, unless the matter were undisputed. The fact that a judicial determination is needed can in no way influence the outcome of the decision as to whether the particular condition has been fulfilled in accordance with the intention of the testatrix.

The deviation principle, which applies to private as well as charitable trusts, permits a variation from the terms of a trust where the circumstances are such that the purpose of the trust would otherwise be defeated or seriously impaired. Scott, op. cit. §§ 167, 381. In such cases the changes allowed have involved the administration of the trust and not its purpose or beneficiaries. Restatement (Second), 1 Trusts § 167. This principle authorizes departures from the means established by the donor for achieving his beneficial objective, but it would not sanction the substitution of an allied or similar charitable purpose for another, as the doctrine of cy pres permits. This rule of deviation would not authorize the elimination of the restriction to Caucasians in this bequest because the limited scope of this principle would not permit the class of beneficiaries to be enlarged to include persons whom the testatrix intended to exclude.

The essential question is whether the testatrix would have preferred the alternative disposition to the charities listed in the residuary clause over the establishment of the hospital trust without the racial

limitation. In this case, no other evidence having been presented, the court is confined to the will in attempting to ascertain her intentions. If the gift over provision was meant to be an expression of her preference, it must be respected.

Where a trust containing a racial restriction has been in operation for many years, having been established in times less conscious of the injustice of discrimination and sanctioned by a less enlightened view of the law, there is some reason to assume that the donor, were he still alive, would choose deletion of the restriction over termination of the trust. Once a charitable trust has taken effect, it is highly exceptional for it to fail because of circumstances arising after its creation. Scott, op. cit. § 399.3, p. 3112. It has been suggested that the doctrine of cy pres should always be applied in such a situation so that the period of control by the "dead hand," so far as any such unbeneficial restriction is concerned, would be limited in some manner analogous to the rule against perpetuities in the case of private trusts. Id. § 399.3, p. 3113; § 399.4, p. 3124. Apparently the English courts take the view that a charitable trust must never be permitted to fail, once it has come into operation, because of subsequent events.

It should also be observed that the basic rationale behind the cy pres doctrine is the maxim of the law's favoritism for charity. Where the alternative beneficiaries in the event of a failure of a bequest to one charity are other recognized charitable organizations, as in this case, there is little reason for the law to show any preference among them. *Jewish Guild for the Blind* v. *First National Bank*, 226 So. 2d 414 (Fla. App.). The only policy to be implemented is the intention of the testatrix as expressed in the will.

The will was executed on February 13, 1964. The line of cases expanding the protection of the fourteenth amendment into areas of discrimination previously tolerated by the law was well developed and widely publicized by that time. It had been ruled that racial covenants in private agreements could no longer be enforced by the courts. *Shelley* v. *Kraemer,* 334 U.S. 1 (1948). The renowned Girard College litigation had proceeded to the point where the United States Supreme Court had held that the city of Philadelphia as trustee of a private school restricted to white people could not lawfully exclude Negroes. *Pennsylvania* v. *Board of Directors,* 353 U.S. 230 (1957). Racial discrimination by the private operator of a restaurant which he leased from a municipal authority as owner of the building had been declared illegal. *Burton* v. *Wilmington Parking Authority,* 365 U.S. 715 (1961). More significantly, so far as this case is concerned, private hospitals which participated in the Hill-Burton program had been required to admit Negro patients and doctors. *Simkins* v. *Moses H. Cone Memorial Hospital,* 323 F.2d 959 (1963). In the related field of public education, the landmark decision of *Brown* v. *Board of Education,* 347 U.S. 483 (1954), with its attendant problems, had been so widely publicized that it is highly improbable that the testatrix or her draftsman was unaware of the complications which would be created by the insertion of this restriction to Caucasians only.

More probably than not the draftsman of the will realized that the racial restriction placed upon the bequest might ultimately be held invalid. Although it is possible that other occasions for failure of the trust were contemplated, the racial restriction would appear, to any reasonably knowledgeable legal practitioner, as the most obvious source of potential illegality. The wording of the condition in the gift

over clause was singularly appropriate to achieve the result of an alternative disposition if this term of the bequest were ruled unlawful: ". . . or if by their terms said trusts either violate any law . . . ." It is a fair conclusion that this clause was meant to be taken literally and that the very event most prominent in the mind of the testatrix as a condition for the gift over was the declaration of invalidity of the racial restriction, which has come to pass.

Courts ought not to attribute to donors a nobility of purpose or loftiness of sentiment beyond that warranted by the evidence in order to achieve a result inconsistent with their intentions as expressed. At least where the alternative bequest is to other charities equally beneficial to society, so far as the law can recognize, the fundamental policy is to carry out the intention stated in the instrument.

In this case it appears that the conditions for the gift over, as stated by the testatrix—inability to operate or violation of law by the terms of the trust—have been fulfilled. Accordingly, it must take effect.

It is concluded that the answers to the questions posed by the complaint are as follows. "(a) Does the limitation in sub-paragraph 3 of Paragraph Fifth of the Will to members of the Caucasian race as determined by the administrator in charge of the hospital violate any law?" Answer: Yes. "(b) Is the 'Kate and Leila Foster Memorial' trust able to operate?" Answer: No: "(c) May the administrator in charge of the hospital comply with the provisions of sub-paragraph 3 of Paragraph Fifth of the Will?" Answer: No. "(d) If said administrator may not or shall not comply with said sub-paragraph 3, may the Trustee comply with said sub-paragraph?" Answer: No. "(e) Can the trust established by Paragraph Fifth of said Will be

administered without complying with said sub-paragraph 3?" Answer: No. "(f) If the answer to the foregoing question is in the negative, should the trust corpus be held and its income distributed to The Salvation Army, Inc.; or should the trust corpus go into the residuary estate?" Answer: The trust corpus should go into the residuary estate.

It does not appear that the circumstances would justify issuance of the injunction sought in the cross complaint of the attorney general. There is no reason to suppose that the plaintiff will not abide by the ruling of the court, subject to any appeal. It was the plaintiff who initiated the request for this adjudication. It is inconceivable that it would not be guided by the ultimate result. No necessity for an injunction has been demonstrated, and this prayer of the cross complaint is denied.

It is ordered that judgment enter accordingly.